— One of the objections on which the motion for a new trial is founded, is, that the presiding Judge expressed or intimated an opinion that certain facts were proved. This is supposed to have been done in those parts of the charge, in which the Judge said to the jury, that "they would inquire why it was, or how it happened. if they believed the witness Woodall, who stated the great superiority of bodily power the prisoner possessed over the deceased; that he was at the bottom in the fight and scuffle, and continued there until the deceased disengaged himself from the prisoner, and attempted to go off, without using the stick in the meantime, which the prisoner held in his hand; that if they believed it was with a view to make the deceased strike him, so as to afford a provocation to take his life, it would be no extenuation of the prisoner's offence; and that, if they collected from his testimony, that the prisoner was not labouring under a strong excitement, immediately after he and the deceased separated, the law did not allow him to reason himself up into a gust of passion, and pursue the deceased, at the time and place stated by the other witnesses, and take his life, and allege that his offence was reduced to manslaughter by the provocation." It is said that in these observations, the Judge assumed as facts, that the witnesses for the state had truly testified; first, that the prisoner did kill the deceased at the time and place mentioned by them; and, secondly, as to the circumstance, that in the scuffle, the prisoner fell at the bottom. To appreciate the force of these objections, it is necessary to recur to the nature of the testimony of Woodall, and the defence of the prisoner, as founded on it. His testimony related to transactions between the prisoner and the deceased, in the morning of the day on which the homicide happened, and was relevant only as it tended to show a provocation then received, which in law would mitigate the crime to manslaughter. That must have been the point contended for in defence. The Judge was examining that point, and advising the jury of the law on it. In the very nature of it, and for the purposes of that inquiry, the death of the party is presupposed; for every justification or excuse admits that to *Page 504 
have been done which is sought to be justified. The objection, therefore, does not apply to the conduct of the Judge, more than to the defence of the prisoner himself. The jury could not have been misled, for with any intelligence, they must have understood that the fact of the homicide must be established to their satisfaction; and that both the defence of the prisoner, in reference to the provocation, and the charge of the Judge, related to a question, which would be consequent on their determination of the main point of the death. On the general character of the case, including that principal point, the Court had previously instructed the jury; and as no exception is taken to that part of the charge, it must be understood by us, that the Judge did not, at that time, intimate his opinion upon the credit to which the witnesses, who deposed to the deed itself, were entitled. Having, in a proper manner, performed his duty thus far, he could not discuss the point raised by the testimony of Woodall, but in connection with a supposed deed, such as the other witnesses had represented. But the jury could not have inferred therefrom, that the Judge held the fact to be established for any other purpose than that to which he was then calling their attention.
We think the other part of the objection is equally untenable. The witnesses for the state deposed to all the circumstances of the fatal rencounter; among which was the one, that when the parties went out of the house, a scuffle ensued, when the prisoner fell, and the deceased on him. It is said the Judge assumed this to be true, and in that respect erred. If that assumption be made, it is manifest that it could not be to the prejudice of the prisoner. We attach, indeed, very little importance to the circumstance in itself, for in a scuffle, the stronger combatant may come to the bottom from many accidental causes, and not by design on his part, or the superior advantage or skill of his adversary. But it is a circumstance which of itself tends to establish, that the person thus found at disadvantage was not the more powerful, or did not bring on the engagement; so that an inference therefrom favourable to the prisoner might have been *Page 505 
pressed on the jury. As the evidences of the fact came from the witnesses against the prisoner, he might insist that it must be taken for true as against the state, and surely he cannot complain that the Court yielded to the force of that argument on his behalf. It is said, however, that there was at least an intimation that the prisoner played a feigned part on the occasion — of which there is no evidence. We are unable to perceive any such intimation. An inquiry into the cause of the prisoner's fall is advised, — whether it happened by accident or design. But there is not the slightest intimation that it was by design. It is assumed that it might have been so, and so unquestionably it might have been. If it was by design, then the deductions just mentioned in favour of the prisoner could no longer be made from it, but it would give rise to others of an opposite character. The instructions actually given were therefore correct, in point of reason and law. If they were, they are not erroneous, although, (as we think is the case here,) they might be unnecessary and immaterial. If the Judge, in summing up, deemed it prudent to notice a circumstance so unimportant, we do not perceive how it could be to the prejudice of the prisoner, unless he should, in relation to it, lay down some rule wrong in itself; and that is not pretended. He certainly left the inquiry of fact entirely to the jury. It might be immaterial, but it could not be harmful to the prisoner; and as to the legal consequences from the result of the inquiry, if one unfavourable to the prisoner could be found, we concur with his Honor.
In the opinion of the Court, there is no cause for a new trial in this part of the case.
It is further insisted that the prisoner is entitled to a second trial, first, for the separation of one of the jurors from his fellows before the verdict was rendered, and secondly, because that juror, during the separation, drank spirituous liquor.
In relation to the latter reason, if we thought it in itself sufficient, there might perhaps be insuperable difficulties in the way of our taking notice of it upon this record. The point was not brought forward until after a mistrial *Page 506 
had been moved for upon another ground, and disposed of: and perhaps the Court refused to consider it then, because it was not in due time, according to the orderly proceedings of the Court. Again, Lord HALE, 2 P. C. 306, lays it down, "that if a juror eat or drink at the charge, for the purpose of the prisoner, and the verdict find him guilty, it is good; but if it find him not guilty, and this appears by examination, the Judge before whom the verdict was given, may record the special matter, and thereupon the verdict shall be set aside." In the next page he states the case of the jury sending for a witness to repeat his evidence, who doth it accordingly: "this appearing by examination in Court, and indorsed upon the record or postea, will avoid the verdict." A Court of errors cannot notice any facts but those appearing in the record; and it appears from the passages cited how matter of this sort ought regularly to appear. Here the record does not set forth that the juror in fact drank spirits, but only that the prisoner offered to prove that he went to get a drink. The presiding Judge is from necessity exclusively to determine the facts. It might be that he did not believe the evidence offered, or it might be, that if heard, it would not have satisfied him of the material fact, that the juror really drank, since it only professed to go to the extent that he went for that purpose, and not that he consummated it. On the other hand, if the objection be valid in law, and the Judge refused the proof, because he deemed the objection invalid, it may be fairly urged, that the facts as offered to be proved, and every reasonable inference from them, ought to be considered as stated in the record; it is thus when an exception is taken to the opinion of the Court against the admissibility of evidence. The error is in excluding such evidence, and therefore it cannot be considered that the facts to which it relates were established, but that they would have been, if the evidence had been received; and because those facts, when established, would in law produce a different result, the judgment given is reversed. It would seem to me, that the justice of the Court, not to say, the humanity of the law, would mete to a prisoner the like benefit in a case of this sort. I *Page 507 
should be extremely reluctant to decide a capital case against the accused upon so nice a distinction, since it is altogether uncertain whether the Judge failed to state the facts directly and with the utmost precision, because he did not find them upon examination, or because he would not enter into the examination, since he deemed the facts immaterial. In favour of life, I would, in such a case of doubt, rather take the latter presumption, and suppose the case was sent to us to determine the law upon the facts, rather than to consider whether the Judge had rightly judged of the facts upon the evidence. I make these observations, with a view to draw the attention of counsel and those who preside at trials to future cases, rather than as material in the present; which we think does not depend on the mode in which the record brings the point before us. Admitting that the juror did drink, and that the special matter had been recorded by the Judge, it is our opinion, that it does not avoid the verdict. It is true that it was not brought forward in this light in the Superior Court, nor in the argument in this Court, but in each was treated as a ground for a new trial. In that sense, it must be addressed exclusively to the Judge who tried the cause. But the true and legal consequence from such misconduct of a jury as vitiates the verdict, is not that the verdict is to be set aside as erroneous, but that it is null, and that there has been a mistrial. For that reason, a venire de novo was awarded, long before new trials, in the modern sense of the term, had any existence; and in the passage in Lord HALE, already quoted, it is stated, that the rule applies as well to verdicts for a prisoner, as to those against him, although a new trial, even to this day, cannot in England be granted in a capital case. But it is our duty to give the prisoner all the advantage to which the whole record entitles him, and to pronounce that there was a mistrial, if it be such in law, although he did not take that specific objection; as it would be to arrest the judgment for any other defect. We have therefore taken into consideration both of the objections to the conduct of the juror, as constituting or not, a mistrial.
It is obvious, upon a slight acquaintance with the history *Page 508 
of the law, that there has been, in different ages, a great difference in the degree of strictness practised towards jurors. It is laid down anciently, that a jury once charged cannot be discharged before they render a verdict, nor can they separate, nor can they eat or drink, without license from the Court. This we find as a general proposition, without any qualification as to cases of felonies or misdemeanors, or cases civil or criminal, or referring, except as to eating or drinking, to leave first granted by the Court. As regards the particular misconduct of eating or drinking, Lord HALE, 2 Pl. C. 306, says, "that though it be not at the charge of either party, anciently it was held it would avoid the verdict," and refers to the Year-book, 24 E. 3, as his authority: yet in the next sentence it appears that it was in his day, and had been ever since 14 Hen. 7, settled, that unless it be at the charges of a party, it is only a misdemeanor, fineable in them that do it, but avoids not the verdict. This is found in a treatise exclusively on the crown law, and therefore the modification must be taken to embrace criminal cases. Lord COKE lays down the same doctrine, Co. Lit. 227. We know, indeed, that innumerable cases are found, in which it has been applied to civil suits, but they had no connection with the subject on which Lord HALE was writing, and he cannot then be supposed to allude to them. We are not aware of any adjudication in England or in this country, in accordance with the most ancient rule of Edward the 3rd's time, but in New York. In that state, it seems that drinking is not tolerated in any shape, during the progression of the trial, and if the liquor be even given by consent of the parties to a civil cause, it vitiates the verdict. We think, however, that the usages of our own state sustained by the clear and venerable authority cited by Lord HALE, ought to outweigh with us the opinion of the most respectable Judges of our sister state. This particular question has moreover been considered and determined by this Court, in a capital case. In Sparrow's case, 3 Murp. 487, I made the objection myself, but the Court held unanimously that it had been settled rightly that taking refreshment vitiates the verdict only in those cases where they are furnished by *Page 509 
the party for whom the verdict is found. I do not dispute that if a juror drink to excess, so as to disqualify himself for his office, it is not only a gross misdemeanor, but it ought to vitiate the verdict. I will not deny that such a case appearing in the record could be acted on by a Court of error. It can however be supposed to occur so seldom, as to render such a jurisdiction almost idle and unnecessary. The necessity for it rests upon the possibility that a Judge would take and retain a verdict from such a jury, which would be a monstrous act. But the supposition that any Judge would commit such an act is in itself equally improbable and monstrous. It is impossible but that the jury would be kept together until they became capable of deciding, or that in a case in which a new trial was allowed, the verdict would be set aside and the cause retried. But on the present case it does not appear that the juror did not provide himself with the spirit, and there is no suggestion that he drank to the slightest degree of intoxication. In our opinion, this misconduct does not render void the verdict that has been taken; we could not hold that, without at the same time declaring, that we would treat in the like manner a contrary verdict, which would be a doctrine alarming to the whole community.
Reasons of the like kind bring me to a similar conclusion upon the subject of the other act of misconduct in the juror. I cannot think, that an absence of a juror for two minutes from the body of the jury, without communication with any person, as far as appears upon this, or any other subject, but to ask for a drink, does, by itself, annul the finding. It is true that I am not able to adduce an English adjudication in point, in a case which appears to be capital; and but one of that description in this country, in which an opinion, similar to that entertained by myself, is expressed. But it is to be remembered, that the rule itself, as anciently laid down, is not by its terms restricted to capital cases. It embraces alike those of every description; and there is not more authority in the courts, without the mandate of a statute, to depart from it in one, than in another case. While I own that I find no instance in which a verdict found by a jury that had separated, has *Page 510 
been held sufficient to authorise sentence of death, I must not, at the same time, omit to mention, that my researches have been equally ineffectual for a case in which the conviction or acquittal of a person, charged capitally, has been set aside for that reason. We, however, do know, that in many cases of that grade, the trial has been adjourned over from one day to another, and the jurors allowed refreshments. Such was the course upon the trials of Stone, Hardy and Tooke, for treason, 6 Term Rep. 530, both with and without the consent of the prisoner; and also in Burr's
trial; and this has been allowed in this state in Kimbrough's Case, 2 Dev. Rep. 431, as a matter of sound discretion. At first this was put upon the ground of necessity, arising out of the length of modern trials; and it was said, that necessity justified what it compelled. But it is plain, thatnecessity is not used in its strict and absolute sense; for the departure of the judge from the jury and place of trial was not unavoidable, and the jury might have slept and eaten in their box. It only means highly convenient to all concerned in the trial, and highly conducive to the purposes of justice, by enabling the judge and jury to apply their faculties to the case before them. That kind of necessity must vary with each case; and therefore it was properly said by Chief Justice HENDERSON, "that it is mere matter of discretion in the court, convenient andnecessary for the exercise of its functions, in which the prisoner's consent has nothing to do." This is one marked departure from the text of the ancient common law, and is one evidence of the sense in which it is now to be understood, as applied to capital cases. It cannot be disputed, that this particular misconduct of departure does not vitiate verdicts in civil causes. It is so laid down by the best elementary writers, and there are numerous adjudged cases in support of it. The like is found on indictments for misdemeanors of the highest grade. How were those exceptions established? By force of the opinions of the Judges of the courts of the common law, as to the true meaning of the rule originally, or as to the sense in which it ought to be received in the present state of society, so as to make it accord with other received modifications of the law. In *Page 511 
the case of Woolf, Kinnear and others for a conspiracy, reported in 2 M. 
S. 462, and better in 1 Chitty's Rep. 401, Chief Justice ABBOTT not only adjourned the court over to next day, but without the knowledge of the accused, permitted the jury to disperse, and each one to spend the night at his own house, with a caution not to have any communication with any person concerning the trial. There not being any suggestion of such communications, a motion to set aside the verdict was made upon the simple and dry ground that it was null, by reason of the separation singly. The court unanimously denied the motion, upon the ground that it was frequently practised, and every instance of it was evidence of the lawfulness of it; and that it ought to be in the discretion of the court. The judges say explicitly, that consent ought and could make no difference, for the accused is not free to deny, and ought not therefore to be asked; nor did the leave of the court justify or give authority to the jury, except as it prevented the act from being a contempt; for the judge's order could not make that lawful which was in itself unlawful. These reasons seem to me to have the utmost weight, and to bring the question down to the single point, whether the rule is now to be considered as a positive, rigorous, inviolable mandate of the law, never to be departed from under any circumstances, or as one to be generally observed, as conducive to expedition in business, and to the fairness of trials; but which admits of exceptions, to be addressed to the discretion of the court, as grounds for a new trial, if there be a suspicion that the jury has been tampered with, or that there was opportunity for it. To the whole court the latter appeared the better interpretation of the principle. That, it is true, was a case of misdemeanor; but the principle seems to me to be the same. Mr. Justice BEST, too, puts the case of a capital felony as one to which the application of the rule, in its literal acceptation would be most alarming; so much so, as to convince him that such could not be the rule. He says, "if the argument is right, it is right to this extent — that if, by any accident, a juror gets out of the box for a single minute, it is amistrial. Let us see the extent to which this doctrine may be carried. *Page 512 
Suppose in the case of a trial for capital felony, some of the jury, by accident, get out of the box, and the prisoner, in the result of the trial, be acquitted, the consequence of this argument would be, that it was a mistrial, and the man must be put on his trial again;" which he deemed, as well he might, too mischievous to be sanctioned as law. It is clear, that is to be the effect of the doctrine, if established. To my mind, the safety, liberty and life of the citizen, who may happen to be accused, stand opposed to it. I do not here, more than I did on the preceding point, contend, that there may not be flagrant cases of misconduct during the separation of the jury, which ought to annual their verdict; and for which, if stated in the record, this Court, as a revising tribunal, might be bound so to do. But the inquiry is, whether every — the least separation — one for two minutes, as here, and next, for one minute or one second, is to have that effect. To me it seems clear, that the interests of the public and of the accused, alike require that we should take the rule as we find it in Lord HALE's time, as it has been known in use and daily practice in England and in this state for many years past, rather than in the obdurate sense imported by its terms, as we first find it expressed. It is worthy of remark, that at that time there were no means in the discretion of the court, for correcting the wilfulness or the mistakes of jurors. Attaints, and the doctrine of mistrials, furnished the only method of redress. It might be much better to lay down as a positive and unqualified text, that acts, which tended to false verdicts, should vitiate all into which they entered, rather than allow those which were, in fact, unjust, through the corruption of the jury, to be obligatory. The more modern practice of granting new trials, affords a readier, easier and more just method of redress; which renders the ancient rigour both unnecessary, and highly inconvenient; not that jurors ought not still to be kept together, and refrain from intoxicating liquors, or that the court should not, in all cases, observe those precautions against the jurors being tampered with, and especially in criminal cases, and, above all, in capital felonies; but when such irregularities do occur notwithstanding *Page 513 
every precaution, the Court now has power, not only of punishing the jurors, but of visiting upon the parties all such consequences from the acts as they appear to the Court to have produced. If the party cause the irregularity, policy requires that a verdict in his favour, however right, should be forfeited. But if the party had no agency in it, there appears little reason for depriving him of his verdict, if proper upon the evidence and upon the law in the opinion of the Court, merely upon the ground that a juror had, without his privity, misbehaved. I have but little doubt that this power of the Court over verdicts in misdemeanors, and in suits between man and man, was the real, though perhaps at the time, the imperceptible cause of the first relaxations in cases of that description. It seems to me to have been a satisfactory and sufficient ground for such a relaxation, if indeed the rule was ever literally received. That it never was, or at any rate has not been for centuries past even in criminal cases, we also learn from Lord Hale, 2 Pl. Co. 296, who states a case where, upon not guilty, there was a jury, one of whom, after their departure out of Court, left his companions; which being discovered by the Court, another juror was sworn in the place of A. He afterwards returned, and being examined by the Court, stated that he went to drink, and had not spoken with the defendant: whereupon his substitute was discharged, and the verdict of A. and the other eleven was taken, though he was fined for his contempt. For this the Year-book of 34 Ed. 3 is cited; which certainly carries us back to a very remote period, almost coeval with the rule in its origin. The case is not stated to have been one of felony; but the contrary does not appear; and if there had been a distinction, that humane and eminent Judge would not have omitted all notice of it. In this country there is some diversity of opinion upon the effect of a separation of the jury. In every state we believe it is held that it does not, per se, vacate a verdict, in civil actions; and as far as we have had access to the reports, in all except Virginia, the rule is the same in inferior crimes. In that state it was held by a majority of the General Court in The Commonwealth v. McCarl, *Page 514 
Virginia Cases, 271, that a separation was fatal to a verdict in grand larceny. The cases in the other states are collected, and well arranged by the reporter, in a note to the case of Smith v. Thompson, 1 Cowen's Rep. 221. To them may be added, the case of Cristopher, 2 Hawy. Rep. 238, in this state. That, it is true, was an indictment for perjury, and was a decision of a District Court only; but the doctrine has been received, and frequently acted on since; and I must again ask, by what authority the law can be modified in one case more than in another. Lord COKE, from whom the text is received, states it with no such modifications; and if they are admissible for the purpose of convenience and aid in the administration of justice in one class of cases, they seem to be equally proper in every other, to which the same reasons apply. In the case of The People v.Douglas, 4 Cowen, 26, the doctrine deemed correct by me, is recognised by the Supreme Court of New York, as applicable to trials for capital felonies: and Mr. Justice WOODWORTH after a review of all the cases, both English and American, adopts the conclusion without hesitation. To the objection that it leaves too much to the discretion of the Judge, I can only reply, that much as every Judge must regret the exercise of discretionary powers, many equally important with this, are possessed by Courts, and it is indispensable that they should be so possessed. It is better that the one in question should be so entrusted, than the verdicts should be absolutely null. If it be a discretion not to set aside a verdict of guilty for this misconduct, when it has not in the judgment of the Court influenced the verdict, it is equally a discretion to let a verdict of not guilty stand under like circumstances. If I am not greatly mistaken in the supposition I have ventured to suggest, as to the causes of the extreme strictness with which juries were in ancient times watched and imprisoned, and of the motives for not continuing it, furnished by the increased facilities of doing justice by milder means through new trials, there is in this state, whatever may be the case in England, full scope for the exercise of a sound discretion on this subject as in others, through the power expressly given by the statute, to grant new trials *Page 515 
in capital convictions. As in other cases, the misconduct of jurors is addressed to the Courts, on a motion for a new trial, and not as constituting a mistrial, why may it not be in this case also? The objection is that it will then rest in discretion. Not so when facts are stated in the record which show that the jury was unduly influenced, or make a case of probable cause for suspicion. To be sure the Judge sitting, must weigh the evidence of those facts, and it rests with him to set them down in the record: but we may safely trust to the integrity of the Judge, to tell the truth, though we are forbidden to place a blind confidence in the correctness of his judgment as to the law. In cases which fall short of raising a suspicion in every reasonable mind that the verdict has been, or may have been produced by some undue influence, I think it safe to leave it to the discretion of the Judge, to throw in slight acts of irregularity in the jury, with other things, to show that the verdict is probably wrong, or is not at least manifestly right, and on that account to set aside the verdict by ordering a new trial. That this ought not to apply to a capital case I will admit, if there were any other safe or practicable way open to us. But I never can agree that a verdict of acquittal should be avoided for two minutes absence of a juror, which is to follow if this verdict of guilty be avoided. Besides, this discretion of granting a new trial in capital cases already exists. Tremendous as it is, and as it is felt to be by every Judge, it has been against their wills, and after repeated refusals of themselves to assume it, imposed on them by legislative authority. It is true, it is only to grant new trials to the accused; but it must ever be remembered, that a discretion to grant, is also a discretion to refuse; which puts the life of every convict in the hands, and at the will of the Judge. I am not alarmed that it should be so to that extent. To all practical purposes and to the ends of justice and humanity, it has heretofore been carried discreetly, and exercised honestly. Unless it shall be abused, the Legislature will have no motive for recalling it, or restricting it, and until that body shall see reason to do so, this Court, I think, ought not, and cannot. *Page 516 
I am therefore of opinion, that judgment of death ought, in law, to be pronounced upon the verdict, against the prisoner, and that the same be accordingly certified to the Superior Court of Wake.